IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| LYNNE A. HARBERS, | ) | Case No. 10 C 50138 |
| | ) | |
| Plaintiff, | ) | |
| | ) | Hon. P. Michael Mahoney |
| v. | ) | U.S. Magistrate Judge |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

### I.      Introduction

Lynn A. Harbers ("Claimant") seeks judicial review of the Social Security

Administration Commissioner's decision to deny her claim for Disability Insurance Benefits

("DIB"), under Title II of the Social Security Act, and Supplemental Security Income ("SSI")

benefits, under Title XVI of the Social Security Act. *See* 42 U.S.C. § 405(g). This matter is

before the Magistrate Judge pursuant to the consent of both parties, filed on October 20, 2010.

*See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.


### II.      Administrative Proceedings

On November 19, 2007, Claimant applied for DIB and SSI, alleging a disability onset

date of November 14, 2007. (Tr. 12.) Claimant's application was initially denied on January 24,

2008 and again denied upon reconsideration on May 23, 2008. (Tr. 12.) Claimant then filed a

timely request for a hearing before an Administrative Law Judge ("ALJ"). (Tr. 12.) The hearing

took place on February 18, 2009 via video teleconference between Evanston, Illinois and Rockford, Illinois before ALJ Maren Dougherty. (Tr. 12, 22.) Claimant appeared in Rockford and testified with her attorney present. (Tr. 12, 22.). Vocational expert ("VE") William Newman was present and testified in Evanston, as did Dr. Ronald A. Semerdijian, a medical expert. (Tr. 12.)

On July 1, 2009, the ALJ found Claimant was not disabled and denied her claims for DIB and SSI. (Tr. 20.) Afterwards, Claimant filed a Request for Review with the Social Security Administration's Office of Hearing and Appeals. (Tr. 1.) The Appeals Council denied that Request for Review on April 23, 2010. (Tr 1.) As a result of this denial, the ALJ's decision is considered to be the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 404.981, 416.1455, 416.1481. Claimant now files a complaint in Federal District Court, seeking judicial review under 42 U.S.C. §§ 405(g), 1383(c)(3).

**III.   Background**

Claimant was born on May 6, 1971. (Tr. 153.) She was thirty-eight years old when she appeared before the ALJ. (Tr. 153.) She stood five feet and five inches tall and weighed approximately 140 pounds at the time of the hearing. (Tr. 153, 199.) Claimant lived in Freeport, Illinois in a mobile home with her eleven year-old daughter. (Tr. 29.) During the hearing, Claimant testified that she did not complete high school, but earned her G.E.D. in 1995. (Tr. 29.)

Prior to her provided onset date, Claimant was employed as a CNA, a day-care assistant,

a fast food cook, a factory worker, and a warehouse worker. (Tr. 208.) Claimant had most recently been employed by Wal-Mart as a part-time cashier for approximately seven months until she was let go on June 30, 2008 for missing work. (Tr. 30.) Allegedly, she was fired due to "excessive absence due to hospitalization." (Tr. 31.) While she was employed she would normally work anywhere form eighteen to thirty-two hours every week. (Tr. 32.)

On an average day, she will wake up at 7:30 to check on her daughter as she gets ready for school. (Tr. 46.) Her daughter wakes up earlier and gets ready for the day on her own. (Tr. 46.) After her daughter leaves for school, Claimant will lie back down and fall asleep. (Tr. 46.) She will re-awaken when her mother calls to check on her around 10:00am. (Tr. 46.) Claimant habitually checks her blood sugar levels every time she wakes up. (Tr. 46.) After 10:00, she will have something to eat and, sometimes, she will do a little laundry. (Tr. 46.)

Claimant testified that her daughter's help is necessary to keep up with the housekeeping. (Tr. 47.) Chores are usually split among them. (Tr. 47.) "Usually I can do the sweeping. [My daughter] takes the mop . . . . When it comes to dishes . . . I might wash a few, go sit back down, get up a little bit later and go wash a few more," Claimant stated. (Tr. 47.)

At the hearing, the ALJ asked Claimant to list the limitations that affect her ability to work from the most significant problem to the least significant. (Tr. 32.) Claimant answered, "diabetes, carpal tunnel, migraine headaches, . . . asthma, and then epilepsy." (Tr. 32.) Claimant did not list her knee or ankle pain, nor did she mention her alleged anxiety or depression. (Tr. 32.) The ALJ proceeded to question Claimant about each symptom. (Tr. 32.)

Claimant testified that her diabetes gives her difficulty because her blood sugar levels fluctuate. (Tr. 36.) "I get very exhausted, very tired. I can't manage to do some things during the day. I get really, really tired," she said. (Tr. 36-37.)

As to the second most significant problem, the alleged carpel tunnel disorder affects both of Claimant"s hands, she testified. "My hands swell. I had the shots . . . in my wrists, and it worked for a couple of years[.] [B]ut now, it . . . started coming back. . . . I have to wake up in the morning from the numbness, shaking them, trying to get them to wake up. I have to run cold water over them," she said. (Tr. 39.) Claimant asserted that she had suffered her carpal tunnel for approximately four years. (Tr. 40.)

When asked about her migraines, Claimant said that they occur every day and will often last anywhere from four to thirteen hours. (Tr. 40.) Claimant stated that she takes five doses of Percocet everyday day to treat the pain. (Tr. 40.) She described her headaches: "It hurts right above my eyes. Sometimes [I] don't even go outside. I keep my blinds shut sometimes, because I don't like the sun. My eyes are very sensitive to it." (Tr. 40.) Claimant admitted that Percocet helps relieve the pain. (Tr. 41.)

As for her asthma, Claimant can often go a "whole day" without using her inhaler. (Tr. 42.) She said that she had an asthma attack in June 2008 that required medical attention. (Tr. 42.) Other than that instance, she had not had a serious attack for approximately a year and a half. (Tr. 42.) She regularly uses her inhaler if she can feel herself starting to wheeze; about two or

three times a week. (Tr. 42.) "Just on certain days," she claimed. (Tr. 42.)

Despite her alleged asthma complications, Claimant testified that she smokes regularly. (Tr. 50.) In the past, she often would smoke up to a half of a  pack of cigarettes every day. (Tr. 51.) However, she stated that she recently had been trying to reduce her habit. (Tr. 51.) She claimed that she had cut her use down to three cigarettes every day for the two weeks prior to her hearing. (Tr. 51.) Curiously, throughout the record, even as far back as June 2006, she claims that she only smokes three-to-four cigarettes when she was asked about her smoking habits. (Tr. 315, 316.)

Next, the ALJ questioned Claimant concerning her epilepsy. (Tr. 42.) Claimant said that she suffers from both grand mal and petit mal seizures. (Tr. 43.) She last experienced a grand mal seizure in late December of 2008. (Tr. 43.) She does not experience them often. (Tr. 43.) Her petit mal seizures are another story altogether. Claimant testified that she may have petit mal seizures five times a week, on average. (Tr. 45.) While experiencing the petit mal seizures, Claimant said that she will "start to space out," but she is usually aware of her surroundings. (Tr. 44.) Often her daughter is able  to "talk" her out of them, and they usually last no more than three minutes. (Tr. 44.)

Later in the hearing, Claimant also complained of pain in her right ankle and left kneecap, stemming from a hit and run accident in September of 2006. (Tr. 45, 49, 644.) Claimant testified: "they wanted to put screws in my ankle, because it was broke[n] completely in half.

They couldn't because of my diabetes. . . . [I]t hurts. It swells. You have to prop it up. I can't get up and do as much. I can't walk as far. I can't be able to sit." (Tr. 49.) According to Claimant, the pain in her knee and ankle have gotten worse in the past several months. (Tr. 49.) However, Claimant did not attribute her knee or ankle pain to her diabetes. (Tr. 45-49.)

## IV.    Medical Background

### A.    Left Knee and Right Ankle Pain

Claimant reported being struck and injured by an automobile while she was walking to work in the late evening on September 5, 2009. (Tr. 316, 318.) This hit-and-run accident was the genesis of her knee and ankle pain. (Tr. 49.) Unfortunately, the record does not include documentation from her emergency room visit. (Tr. 316.) Dr. John S. Debush, M..D., reported that Claimant was taken to the emergency room by a private vehicle, and that she was given Vicodin for pain. (Tr. 318.) She was only given splints to support her legs. (Tr. 319.)

She described the pain as a dull tooth-ache type pain. (Tr. 319.) The sensations would sometimes become sharp when she moved her legs. (Tr. 319.) She told Dr. Debush that the prescribed Vicodin did not help the pain. (Tr. 320.) Yet, Claimant said that her leg pain was relieved when resting her leg on a pillow. (Tr. 319.) The court presumes that this implies Claimant's pain was alleviated when she elevated her legs. (Tr. 319.)

When reviewing Claimant's x-rays, Dr. Debush described a "non[-]displaced fracture of

the lower pole patellar with minimal gap on one end about [two millimeters in length]" under her left knee. (Tr. 321) X-rays of the right ankle showed a "vertical fracture of the medial malleolus, which [was] essentially very minimally displaced." (Tr. 321.) "This [ankle] fracture was sustained by direct contusion and not by twisting injury." (Tr. 321.) "I do not think that she is going to need surgery. She should heal the fracture relatively well and I do not think she will have much [of a] problem," he stated. (Tr. 321.)

Dr. Debush later noted that surgery could theoretically be performed, but referred Claimant to Dr. James Faremouth for another opinion. (Tr. 331.) During Dr. Faremoth's examination on September 26, 2006, Claimant opted to pursue a non-surgical treatment course. (Tr. 334.) Dr. Faremouth encouraged Claimant to continue using a brace boot on her ankle and the immobilizer for her knee. (Tr. 344.)

On October 3, 2006, x-rays "demonstrate[d] excellent healing of the pole of the patella[,] and excellent healing and position of the medial malleolus." (Tr. 336.) Claimant requested a renewal of her Percocet prescription. (Tr. 336.)

Two months later, on December 5, 2006, Claimant saw Dr. Debush for a final follow-up appointment. (Tr. 341.) Dr. Debush stated "X-ray of the right ankle is showing [a] satisfactorily healed fracture and I am amazed how much of the fracture healed so fast. . . . X-ray of the left knee . . . [is] healing quite well without any significant problem and no step off." (Tr. 341.) He continued, "[a]t this time, she is actually asking to go back to her job." Dr. Debush planned to

release her for work on December 18, 2006, but "for one week we would like her to avoid [working for] eight hours a day." He opined that she could may walk or stand five-to-six hours every day until December 31. (Tr. 341.) She could then resume regular work activity. (Tr. 341.)

Little more than a year later, on December 28, 2007, Claimant saw general practitioner Dr. Michael J. Muise at the Monroe Clinic after she fell at home. (Tr. 423.) On a scale from one through ten (ten being the most extreme pain), Claimant assessed her pain to be at a level of six. (Tr. 423.) Dr. Muise stated that the pain improved slightly with Darvocet. (Tr. 423.) X-rays showed "[o]steoarthritis and spurring is present at the anterior tibia. There is a prominent posterior process of the talus. [There is] [n]o evidence [of] acute fracture or dislocation." (Tr. 430.)

Claimant returned complaining of bilateral ankle swelling on June 12, 2008. (Tr. 544.) Dr. Muise wrote that the "overall course for this is to get worse over time. The injuries developed when she was wearing athletic shoes. She notes the pain is [nine out of ten]" (Tr. 544.) Dr. Muise found the pain was generated by muscle and tendon strain and refilled Claimant's Darvocet prescription. (Tr. 546.) "Medication compliance is stressed," he added. (Tr. 546.). Dr. Muise did not write any instruction as to Claimant's ability to return to work. (Tr. 546-547.)

**B.** **Diabetes**

Claimant has a long history of complications relating to her uncontrolled diabetes. (Tr. 353, 410, 422, 426, 532, 538, 541, 544, 547, 549.) On February 8, 2007, she was admitted to Freeport Memorial Hospital due to complaints of severe chest pains after Claimant suffered a fall. (Tr. 353.) Upon evaluation, Claimant was found to have "a very elevated blood sugar of over 500." (Tr. 353.) She complained of severe pain and was given Morphine and Toradol. (Tr. 353.) She improved and was discharged on February 10. (Tr. 353.) Attending physician Dr. Diann Bennett indicated Claimant had a medical history of type-one diabetes, but "has not been taking her regular medications and has not been eating well." (Tr. 366.) "She complains of some nausea and vomiting. . . . Otherwise, [Claimant] is doing well," Dr. Bennett added. (Tr. 366.)

On November 18, 2007, Claimant reported to the Monroe Clinic, complaining of "feeling ill." (Tr. 410.) Dr. Muise wrote that "for the past . . . month, [Claimant's] blood sugars have been uncontrolled. Her machine has been running high." (Tr. 410.) During another visit on December 5, 2007, Dr. Muise noted "diabetes mellitus type 2, uncontrolled[.] [C]ompliance urged. Meds per orders." (Tr. 422.) Five days later, Claimant returned, complaining of "multiple medical problems." (Tr. 426.) Dr. Muise's record states: "[t]he patient continues to not take her insulin on a frequent basis due to medical noncompliance." (Tr. 426.)

Dr. Muise continuously noted Claimant's poor habits throughout the following year:

- March 27, 2008: "She is chronically noncompliant with her insulin." (Tr.

549.)

- May 5, 2008: "She has brittle control, frequently not taking insulin in the past." (Tr. 547.)

- June 12, 2008: "The patient has diabetes mellitus type 2. It has been uncontrolled for months." (Tr. 544.) Dr. Muise notes that Claimant works at Wal-Mart as a cashier. (Tr. 544.) In his assessment he urges medical compliance. (Tr. 546.)

- September 30, 2008: "She has diabetes mellitus type 1. She has tried to be better with her diet. . . . She does not take her sugars regularly . . . . She has a [history] of noncompliance with her diet and insulin." (Tr. 541.)

- October 26, 2008: "Chronic medical noncompliance is a problem for [Claimant]." (Tr. 538.)

- December 4, 2008: "She is compliant with her insulin, not compliant with her diet." (Tr. 532.)

## C.    Asthma

On November 18, 2007, Claimant saw Dr. Muise because she was "feeling ill." (Tr. 410.) Dr. Muise's notes reveal that Claimant had moderate "persistent asthma." (Tr. 410.) "She takes [A]dvair twice daily. She takes [X]openex on a regular basis. She has been coughing and wheezing daily, with daily nocturnal symptoms." (Tr. 410.) Dr. Muise urged Claimant to quit smoking. (Tr. 412.) "She understands that this is bad for her health," he wrote. (Tr. 410.)

Dr. Muise saw Claimant on February 22, 2008 when she complained of cough, shortness of breath, and wheezing. (Tr. 418.) He instructed Claimant to return the following week to recheck her breathing. (Tr. 420.) Claimant's smoking was again a topic of discussion. (Tr. 418.)

Claimant returned on February 27, 2008, following the earlier exacerbation of her asthma symptoms. (Tr. 415.) Dr. Muise stated that Claimant showed improvement, but she still experienced some coughing and wheezing. (Tr. 415.)

Claimant saw Dr. Muise again on March 27, 2008, complaining of asthma complications . (Tr. 549.) Dr. Muise wrote that her asthma has improved since she had been prescribed Prednisone. (Tr. 549.) Claimant agreed that "her breathing [has] markedly improved." (Tr. 549.) The report states that she was "negative for" cough, shortness of breath, and wheezing. (Tr. 551.) She was ordered to return in approximately three months "for revisit [of] medical problems." (Tr. 551.)

During office visits in May and September of 2008, Claimant complained of "multiple medical problems." (Tr. 541, 547.) Dr. Muise's notes again mention Claimant's asthma: "She has been on Advair, Singulair, and Xopenex. The overall course for her breathing is to be stable over time." (Tr. 541, 547.) Medical compliance was urged. (Tr. 543, 549.)

**D.**     **Epilepsy:**

The medical record does mention that Claimant suffers from epilepsy. (Tr. 547, 367.) During her visit to Dr. Muise on May 5, 2008, the epilepsy is mentioned only in passing: "[Claimant] takes [T]egretol for her epilepsy. . . . She denies recent seizures." (Tr. 547.) However, the record is sparse concerning any specific complications from Claimant's condition.

**E.**     **Migraine / Headache:**

When Claimant saw Dr. Muise on September 30, 2008, she complained of "multiple medical problems." (Tr. 541.) Dr. Muise writes that Claimant has a history of migraine headaches. (Tr. 541.) "She gets them almost daily. They are associated with photophobia. She has been taking . . . [V]icodin for her headaches and left ankle pain." (Tr. 541.) Her history of migraines has been documented sparingly throughout the record, but any complications relating to the condition are not thoroughly discussed; often described as "stable." (Tr. 411, 415.)

**F.     Carpel-Tunnel Syndrome:**

As to her carpel-tunnel pain, the medical records do not seem to make mention of any symptoms. It is noted in many medical reports, under the "medical history" sections, that Claimant had suffered a carpal fracture of the left wrist in June of 2005. (Tr. 419, 422, 424.) It does not appear that any medical records are available where Claimant has been specifically diagnosed with or experienced carpal-tunnel pain.

**G.     Anxiety and Other Mental Health Issues:**

On December 10, 2007, Dr. Muise notes that the Claimant has a history of anxiety issues. (Tr. 426.) "For this, she has been taking [A]lprazolam three times per day, as needed. She does, on average, take this twice per day." (Tr. 426.) Later the next year, on September 30, 2008, Dr. Muise writes that Claimant has a history of depression and anxiety. (Tr. 541.) "She has been

using [X]anax PM. . . . Has been using this up to three times a day. . . . She requests a refill of this today." (Tr. 541.)

Claimant underwent a consultation on January 1, 2008, at the request of Freeport Memorial Hospital's Emergency Department. (Tr. 445.) Apparently, the request was made because Claimant has a "history of suicidal attempts, history of substance abuse, [hopeless] feelings, mood not consistent with illness, and a possible psychiatric problem in need of a mental health referral." (Tr. 445.) An attending emergency room nurse reported that Claimant, at some point during her visit, stated "just call me dead." (Tr. 445.) During the consultation Claimant listed her stresses as "bills" and "working at Wal[-]Mart and stocking shelves." (Tr. 445.) Her history includes "attempted suicide by overdose at age [thirteen] about a boy[;] Stupid!" she commented. (Tr. 445.) "She also indicates that she is a childhood victim of sexual abuse. She does not meet the criteria for psychiatric hospitalization on this date. She refuses further services." (Tr. 445.)

In a report written by Gerald K. Hoffman, M.D., F.A.P.A. and dated April 21, 2008, he states that Claimant is a thirty-seven year-old "nervous mother of three children. . . . never been married – with the same man for 21 years." (Tr. 473.) "We just separated," Claimant said. "I left him because of too much verbal abuse. . . . I have had to ask for economic help since we broke up." (Tr. 473.) The report continues, "She is a worry wart, feels restless most of this time, easily fatigued, can't concentrate and mind goes blank, is irritable, muscles always tensed up, cannot

sleep." (Tr. 473.)

Dr. Hoffman's impression was that Claimant suffers from chronic General Anxiety Disorder with Depression. (Tr. 474.) "Anxiety due to economic stress has increased due to separation from common law husband." (Tr. 474.)

A mental RFC assessment was completed by State Agency Doctor Jerrold Heinrich, Ph.D. on May 12, 2012. (Tr. 492.) Dr. Heinrich found that Claimant was moderately limited in the ability to maintain attention and concentration for extended periods and in the ability to respond appropriately to changes in the work setting. (Tr. 490-491.) Every other category in the assessment was either marked "Not Significantly Limited" or "No Evidence of Limitation." (Tr. 490.)

Dr. Heinrich noted the following:

- Claimant is "behaviorally limited by an adjustment disorder with mixed anxiety and depression."

- Basic reality testing for day to day functioning is "adequate."

- Cognitive functioning is "essentially unremarkable."

- Claimant is able to "complete most essential activities."

- Claimant is able to understand, remember, and execute detailed instructions.

- Although Claimant can concentrate and persist adequately, she "needs a low-stress job where there are not tight time deadlines or high production quotas."

- Claimant can adjust to routine changes in her environment, "as long as they are not too frequent."

- Claimant "retains the mental capacity and sufficient emotional stamina to do simple tasks within the limitations noted."

(Tr. 492.)

### H.  Residual Functional Capacity Findings:

Non-treating physician Dr. Ernst Bone completed a physical residual functional capacity ("RFC") on January 18, 2008. (Tr. 449.) Dr. Bone found that Claimant had no exertional limitations, no manipulative limitations,  no visual limitations, and no communicative limitations. (Tr. 450, 452, 453.) He concluded that Claimant had some postural limitation, as she should avoid ladders, ropes, and scaffolds due to her epilepsy. (Tr.541.) Claimant could only occasionally climb ramps and stairs, as well. (Tr. 451.) Because of Claimant's asthma and epilepsy, Dr. Bone noted a few environmental limitations such as the need to avoid dangerous hazards, odors, dusts, gases, and areas with poor ventilation. (Tr. 453.)

Less than a month later, Dr. Muise submitted a "Diabetes Mellitus Residual Functional Capacity Questionnaire" on February 12, 2009. (Tr. 631.) According to the form, he diagnoses Claimant with "[Diabetes] [t]ype 2, HTN, [g]astroparesis, [n]europathy, asthma, epilepsy . . . osteoarthritis of the [left] ankle." (Tr. 631.) "POOR PROGNOSIS," he notes afterwards. (Tr. 631.)  Further, he lists Claimant's symptoms as follows: fatigue; extremity pain; muscle

weakness; frequent urination; psychological problem; excessive thirst; headaches; hyper/hypo

glycemic attacks; general malaise; difficulty walking; episodic vision blurriness;

infections/fevers; difficulty thinking/concentrating; dizziness/loss of balance; and

nausea/vomiting.   (Tr. 632.)

Throughout and eight-hour workday, Dr. Muise indicates that Claimant must

- only occasionally lift ten pounds;
- never lift greater than twenty pounds;
- rarely twist, stoop, bend, or climb stairs;
- never crouch, squat, or climb ladders;
- avoid constant exposure to "wetness;"
- avoid even moderate exposure to high humidity;
- avoid all exposure to extreme temperatures, cigarette smoke, perfume, soldering fluxes, solvents and cleaners, fumes, odors, gases, dust, and chemicals;
- shift positions from sitting to standing at will;
- limit her sitting and standing to thirty minutes at a time, not to exceed two hours total;
- walk every thirty minutes for five minutes;
- elevate her legs fifteen inches for four hours;
- frequently lift less than ten pounds;
- never lift more than 20 pounds;
- only rarely twist, bend, and climb stairs; and
- never crouch, squat, or climb ladders

(Tr. 631-634.)

In addition, Dr. Muise notes that Claimant

- is only able to use her hands ten-percent of the day to grasp, turn, or twist objects.
- is only able to use her fingers five-percent of the day for fine manipulations.
- can only reach with her arms for five-percent of the day.
- can only walk a single block without severe pain

- is incapable of even "low-stress" jobs.
- experiences pain and other symptoms that would constantly interfere with her attention and concentration as needed to perform even simple work tasks
- suffers from anxiety that affects her physical condition.
- is not a malingerer.

(Tr. 631-634.)

Dr. Muise also provided a supplementary letter, dated February 26, 2009, where he seeks to clarify his stance for the ALJ: Claimant "does have neuropathy and chronic nerve symptoms. She is so complex that [these] problems haven't been documented as well as possible." (Tr. 639.) He continues, "The patient does indeed complain of all the problems that are noted . . . . She is not a malingerer. She is one of the patients that I see that actually needs to be on disability." (Tr. 640.)

Lastly, the medical record contains an additional RFC questionnaire completed by Dr. Paul Bekx from Monroe Clinic. (Tr. 723.) However, it appears as though this material was not submitted to the ALJ, but to the Appeals Counsel on August 10, 2009. (Tr. 722.) Generally, the court "may not reverse an [ALJ]'s decision on the basis of evidence first submitted to the Appeals Council." *Eads v. Sec'y of Dept. of Health & Human Services*, 983 F.2d 815, 818 (7th Cir. 1993). However, under 42 U.S.C. § 405(g), the court may consider such evidence "only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." That burden has not been met. Therefore, the court will not consider the "Bekx questionnaire" in its analysis of the ALJ's decision.

**V.**     <u>Standard of Review</u>:

The court may affirm, modify or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). The ALJ's legal conclusions are reviewed *de novo*. *Binion v. Charter*, 108 F.3d 780, 782 (7th Cir. 1997). However, the court "may not decide the facts anew, re-weigh the evidence or substitute its own judgment for that of the [ALJ]." *Id.* The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case are entrusted to the Commissioner. *Schoenfeld v. Apfel,* 237 F.3d 788, 793 (7th Cir. 2001) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner.")

If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C . § 405(g); *see also Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion,* 108 F.3d at 782. If the ALJ identifies supporting evidence in the record and builds a "logical bridge" from that evidence to the conclusion, the ALJ's findings are supported by substantial evidence. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). However, if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

**VI.**  **Framework of Decision**

"Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §423(d)(1)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C §423(d)(3).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. *See* 20 C.F.R. §404.1520. The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity, (2) whether the claimant suffers from a severe impairment, (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments, (4) whether the claimant is capable of performing work which the claimant performed in the past, and (5) whether any other work exists in significant numbers in the national economy which accommodates the claimant's residual functional capacity ("RFC") and vocational factors. *See* 20 C.F.R. §404.1520.

**VII.**  **Analysis**

  **A.**  **Step One: Claimant is not currently engaged in substantial gainful**

**activity.**

In the Step One analysis, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties and is done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If Claimant is engaged in substantial gainful activity, he or she is found "not disabled" regardless of medical condition, age, education, or work experience, and the inquiry ends. If Claimant is not engaged in substantial gainful activity, the inquiry proceeds to Step Two.

Here, the ALJ found that Claimant has not engaged in substantial gainful activity since November 14, 2007. (Tr. 14.) Neither party disputes this decision. As such, this court affirms the ALJ's Step One determination.

**B.      Step Two: Claimant Suffers From Severe Impairments.**

Step Two requires a determination whether the claimant is suffering from a severe impairment. A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers a severe impairment, then the inquiry moves on to Step Three. If the claimant does not suffer a severe impairment, then the claimant is found "not disabled," and the inquiry ends.

In performing the Step Two analysis in this case, the ALJ found that Claimant had the following severe impairments: diabetes mellitus ("as it is in poor control due to noncompliance"), neuropathy, asthma, seizure disorder, post traumatic arthritis in the right ankle, and an anxiety disorder. (Tr. 14.) The substantial evidence in the record supports the conclusion that Claimant suffered severe impairments. Neither party disputes this decision. As such, this court affirms the ALJ's Step Two determination.

C.     **Step Three: Claimant's impairment does not meet or medically equal an impairment in the Commissioner's listing of impairments.**

At Step Three, Claimant's impairment is compared to those listed in 20 C.F.R. pt. 404, subpt. P, app. 1. (the "Listings"). The Listings describe, for each of the body's major systems, impairments which are considered severe enough *per se* to prevent a person from adequately performing any significant gainful activity. 20 C.F.R. §§ 404.1525(a); 416.925(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to a listed impairment, then the claimant is found to be disabled, and the inquiry ends. If not, the inquiry moves on to Step Four.

In performing the Step Three analysis in this case, the ALJ determined that none of Claimant's impairments met or medically equaled the level of severity contemplated for any impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1. (Tr. 14-15.) Neither party disputes this finding. As such, this court affirms the ALJ's Step Three determination.

**D.     Step Four: Claimant is not capable of performing work which Claimant has performed in the past.**

At Step Four, the Commissioner determines whether the claimant's RFC allows the claimant to return to past relevant work. RFC is a measure of the abilities which the claimant retains despite his or her impairment. 20 C.F.R. § 404.1545(a), 416.945(a). The RFC assessment is based upon all of the relevant evidence, including objective medical evidence, treatment, physicians' opinions and observations, and the claimant's own statements about his or her limitations. *Id*. Although medical opinions bear strongly upon the determination of the RFC, they are not conclusive. The determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2); *see Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995).

Past relevant work is such work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565(a), 416.965(a); Social Security Ruling 82-62. If the claimant's RFC allows the claimant to return to past relevant work, the claimant will not be found disabled; if the claimant is not able to return to past relevant work, the inquiry proceeds to Step Five.

Before considering the Step Four analysis, the ALJ determined Claimant's RFC:

- Claimant has the RFC to perform sedentary work;

- She is unable to stand or walk for more than a total of one hour in an eight-hour workday;

- unable to tolerate exposure to concentrates pulmonary irritants or temperature extremes;

- unable to work around hazards such as unprotected heights or moving equipment.

- In addition, Claimant "can perform simple work tasks within limits with the need for a low stress job where there no high production standards or strict time deadlines; and able to adjust to changes in her work environments as long as they are not too frequent."

(Tr. 17.)

The record shows the ALJ found that the "testifying medical expert, Dr. Semardijan's opinion as to the [Claimant's RFC was] well supported by the evidence and adopted" in her decision. (Tr. 17, 19.) The ALJ relied almost exclusively on Dr. Semardijan's testimony when determining the Claimant's RFC. (Tr. 15-19.) Dr. Semardijan's opinion differs greatly from Dr. Muise's findings. Dr. Semardijan testified that, in his opinion, Dr. Muise's findings were not supported by the record. (Tr. 66.) Dr. Semardijan found several parts of the record which would indicate that Claimant was in better condition at the time the records were made than the disability RFC report of the treating physician.

After analyzing the medical record, Dr. Semardijan believed Claimant

- is capable of sedentary work[1];

---

[1] The Dictionary of Occupational Titles defines sedentary work as "[e]xerting up to 10 pounds of force occasionally . . . and/or a negligible amount of force frequently . . . to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met." Dictionary of Occupational Titles, Appendix C, *available at*

- would not have difficulty sitting for eight hours a day;
- could stand and walk for less than two hours;
- needs to avoid pulmonary irritants because of her asthma;
- should limit her lifting to fifteen pounds or less;
- suffers from nausea related to her uncontrolled blood sugar levels;
- had history of seizures in the past;
- and experienced anxiety and depression.

(Tr. 57, 58, 62, 64.)

The ALJ found Claimant has past relevant work as a factory worker, a teacher's assistant, and a certified nurse's assistant; concluding all of Claimant's past relevant work was beyond her RFC because it was either semi-skilled, light in exertion, or both. (Tr. 19.) Consequently, the ALJ determined that Claimant was unable to perform any past relevant work. (Tr. 18.)

i.      **Claimant asserts that the ALJ improperly rejected the RFC interpretations of Dr. Muise as she did not act in accordance with S.S.R. 96-2p or 20 C.F.R. 404.1527.**

The Guidelines list those factors that the ALJ must consider when determining what weight to give to a treating physician. *See* 20 C.F.R. § 404.1527 (c)(2). Specifically, the ALJ is to contemplate the nature and extent of the treatment relationship, supportability and consistency within the record, and any of the treating physician's specializations. *Id.* In S.S.R. 96-2p, the regulations set fourth that even if the treating physician's opinion is not entitled to controlling weight, it is "still entitled to deference and must be weighed *using all of the factors* provided in 20 CFR 404.1527 and 416.927." S.S.R. 96-2p. (emphasis added).

---

http://www.occupationalinfo.org/appendxc_1.html#STRENGTH; *see also* C.F.R. § 404.1567 (a).

The ALJ specifically rejects Dr. Muise's opinion in her report: "the treating source opinion from Dr. Muise is rejected . . . as it is unsupported by the treatment notes. It even has limitations that are unrelated to any impairment." (Tr. 19.) There is little further discussion of Dr. Muise's opinion. The ALJ does not mention the nature and extent of the treatment relationship between Dr. Muise and Claimant, nor Dr. Muise's specializations or lack thereof. Although "supportability and consistency within the record" may be the most important factors to consider when determining the weight to give a treating physician's opinion, the regulations require that it must be weighed *using all of the factors* provided in 20 C.F.R. 404.1527 and 416.927. S.S.R. 96-2p. It is unclear that the ALJ did that. The court points out the main substantive evidence that supports the RFC that was determined by the ALJ is really the opinions of Dr. Semardijan. Additionally, there are some excerpts from the medical record which were pointed out by the ALJ and also Dr. Semardijan and his testimony. Claimant's testimony, the opinions of the treating physician, and the number of ailments would not support this RFC. Claimant has a complicated medical history. She has artho-arthritis with spurring in her anterior tibia. She has a history of bi-lateral ankle swelling which is associated with muscle and tendon strain. She has a long history of diabetes with complications, asthma, and it is unclear from the record what her situation is in regard to epilepsy. She has testified to having migraine headaches, and she clearly has anxiety and other mental health issues.

 

      **E.**       **Step Five: Claimant is capable of performing work existing in substantial numbers in the national economy.**

At Step Five, the Commissioner must establish that Claimant's RFC allows Claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. § 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon the VE's testimony, or by showing that Claimant's RFC, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "Grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987); Social Security Law and

Practice, Volume 3, § 43:1. If the Commissioner establishes that sufficient work exists in the national economy that Claimant is qualified and able to perform, then Claimant will be found "not disabled." If no such work exists, Claimant will be found to be disabled.

After the hearing, the ALJ relied on the testimony of a VE to determine if Claimant could perform any substantial gainful work that exists in significant numbers within the national economy. (Tr. 19). (*See* 20 C.F.R. Pt. 404, subpt. P, App. 2, Table No. 2, Rule 201.21, 201.28). The VE testified that a person of Claimant's age, education, work experience, and RFC is able to perform the requirements of such representative occupations as: order clerk (12,250 jobs in Illinois, 8,500 jobs in the Chicago metro area); bench assembly (14,862 jobs in Illinois, 9,958 jobs in the Chicago metro area); sorter (22,920 jobs in Illinois, 12,840 jobs in the Chicago metro area). (Tr. 20.) In consideration of this testimony, the ALJ found that there are jobs that exist in

significant numbers in the national economy that Claimant can perform. (Tr. 18.) (*See* 20 C.F.R. 404.1560(c), 404.1566, 416.960(c), and 416.966).

> **i.      The ALJ may not have properly evaluated the VE's testimony.**

Claimant argues that the VE did not clearly testify that Claimant would be capable of performing the jobs of sorter and bench assembler. This court agrees.

During the hearing, the ALJ presented the VE with a hypothetical claimant who could "do simple tasks within limits, but . . . needs a low-stress job where there are *no tight time deadlines or high production standards*." (Tr. 77.) (emphasis added). When discussing the sorting and bench assembly jobs in the region, the VE hesitated:

> The -- what I am trying to think in my head in terms of the, the part that I am trying to deal with is the, the low stress, tight time deadlines? . . . The reason I am hesitating is because, in fact, typically, what I look at is like a [hand assembler, bench assembler, or sorter] – There are production standards. They're not necessarily, you know, -- I mean, . . . it's how it's perceived. I mean, . . . it's a very regulated -- you know, you work eight hours; you have to produce ['x'] amount of work within that eight hours. So, . . . it's that really tight timeline specific for an eight-hour period work has to be done. So, I don't know if it exactly fits within that --.
>
> (Tr. 78-79.)

The ALJ stopped the testimony and pressed on: "let me back up a little bit. As . . . I understand it, there are two   . . . kinds of production jobs[:] those on the line and those off the line . . . . [and] I would assume the bottom line is more stressful, because you have to keep up with a machine," she said. (Tr. 79.)  The VE agreed, and then, as if the previous labyrinthine monolog never took place, he began to list the numbers in which the hand assembly position exists in the region without addressing the issue further. (Tr. 79.)

Both the ALJ and the Claimant failed to have the VE clarify his impressions concerning Claimant's ability to abide strict production standards. At this stage in the analysis, the Commissioner bears the step-five burden of establishing that the claimant can perform other work that "exists in significant numbers in the national economy." 20 C.F.R. § 404.1560(c)(2); *see also Britton v. Astrue,* 521 F.3d 799, 803 (7th Cir. 2008); *Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 352 (7th Cir. 2005). A VE's testimony can satisfy this burden only if that testimony is reliable. *Britton,* 521 F.3d at 803; *McKinnie v. Barnhart,* 368 F.3d 907, 910 (7th Cir. 2004).

Assuming that the production-standard requirement would eliminate the jobs of sorter and bench assembly, the VE did provide a third option: order clerk. (Tr. 81.) The existence of the order clerk position, not being affected by production standards and existing in significant numbers (12,250 jobs in Illinois, 8,500 jobs in the Chicago metro area) (Tr. 20), would reduce

the ALJ's failure to address the VE's inconsistency concerning "low-stress work" to harmless error.

### ii. The VE's designation of sedentary work was a proper response to the ALJ's hypothetical.

Claimant also argues that the ALJ and VE misapplied the definition of sedentary work at the hearing. The ALJ's hypothetical involved a claimant who could stand and walk for no more than one hour. (Tr. 77.) The jobs that the VE provided are classified as "sedentary" and S.S.R. 83-10 sets the parameters of sedentary work: "since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about [two] hours of an [eight]-hour workday . . . . Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles." S.S.R. 83-10.

Claimant takes issue with the VE's provided jobs, asserting that the sedentary designation would require her to stand or walk for two hours; twice as long as the "one-hour limitation" supplied by the ALJ's RFC. The regulations state: "periods of standing or walking should generally total no more than about [two] hours. . . ." *Id.* The "one-hour limitation" set by the ALJ's RFC could fit into that definition. "One hour" is "no more than two hours." The court believes the VE understood the hypothetical and responded with the one hour limitation in mind.

### iii. ALJ failed to address Claimant's need to elevate her legs in her decision.

Finally, Claimant testified that she needed to elevate her legs to alleviate her pain. (Tr. 319.) In his RFC, Dr. Muise also stated that Claimant should elevate her legs fifteen inches off of the ground for four hours a day if employed in a sedentary job. (Tr. 632.) The medical expert does not take this limitation into consideration during his testimony, and the ALJ's decision is silent concerning Claimant's supposed need to elevate her legs.

The medical expert and the ALJ did briefly mention the restriction during the hearing, but only in passing. (Tr. 63.) It was noted that Dr. Muise had checked the box that indicated that Claimant *did not* need to elevate her legs in his RFC form, but then directly indicated that she *would* need to elevate her legs fifty-percent of the time[2]. (Tr. 63, 632.) Otherwise, the alleged restriction does not appear in the ALJ's determination, as though the leg-elevation requirement was somehow lost among Claimant's other conditions and forgotten.

Importantly, during his cross-examination, Claimant's attorney had the providence to ask the VE: "Now, if the hypothetical person . . . had to raise, . . . one leg [fifteen] inches half the time during a day, what would that do to those jobs?" The VE responded, "That would eliminate those jobs." (Tr. 84.)

Even if the ALJ intentionally declined to add the restriction to her RFC, without any discussion as to why she rejected the Claimant's testimony and her physician's claims

---

[2]After the hearing, Dr. Muise wrote a letter to the ALJ, admitting that he had mistakenly checked the "no elevation" box, and that he intended to communicate that Claimant would need to elevate her legs. (Tr. 639.)

concerning the elevated leg requirement, this court cannot rule that the ALJ based her decision on substantial evidence. The Commissioner argues that this possible oversight is harmless error. In light of the VE's testimony that this restriction would preclude the listed positions, the court does not agree. The ALJ simply ignored the elevated-leg restriction.

While in some respects the ALJ did an admirable job piecing together a difficult record, the ALJ failed to build a sufficient bridge between Claimant's many ailments and the opinions of the long-treating physician. There are many ailments, direct limitations imposed by the treating physician, an extensive medical treatment record, many medications taken, overlapping emotional problems, and the RFCs that were determined. The court believes the case should be remanded for the ALJ to again look at this extensive record in more depth to better build a sufficient bridge between the evidence and her findings.

**E N T E R:**

_____

**P. Michael Mahoney, Magistrate Judge**

**DATED:    5/20/2013**